UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


CAESARS ENTERTAINMENT OPERATING                                    PLAINTIFF
COMPANY, INC., as fiduciary and on behalf of,
HARRAHS OPERATING COMPANY, INC.
WELFARE BENEFIT PLAN


v.                                                                NO. 3:13-CV-00620-CRS


MICHAEL JOHNSON, and                                              DEFENDANTS
BRIAN CLARE, individually, as administrator
and fiduciary of his client trust "IOLTA" account,
and as owner-operator of BRAIN E. CLARE –
ATTORNEY AT LAW

## MEMORANDUM OPINION

This matter is before the court on the following motions:

(1) Motion by the Defendants, Michael Johnson ("Johnson") and Brian Clare ("Clare"), in his individual capacity, as administrator and fiduciary of his client trust "IOLTA" account, and as owner operator of Brian E. Clare – Attorney at Law, to dismiss Counts V, VI, and VII in the Amended Complaint (DN 29) pursuant to Federal Rule of Civil Procedure 12(b)(6) (DN 45);

(2) Motion by the Defendants, Johnson and Clare, to stay further proceedings on Counts V, VI, and VII until the Court rules on their motion to dismiss (DN 52);

(3) Motion by the Plaintiff, Caesars Entertainment Operating Company, Inc., as fiduciary and on behalf of Harrahs Operating Company, Inc. Welfare Benefit Plan ("Caesars") for summary judgment on all claims, Counts I-VII, in its Amended Complaint (DN 29; DN 51);

(4) Cross-motion by the Defendants, Johnson and Clare, for partial summary judgment on Counts I, II, III, and IV (DN 53).

Fully briefed, these matters a now ripe for adjudication.   Having considered the parties'

respective positions, the Court concludes that the Defendants' motion to dismiss is without merit

and that there are no material issues of fact in dispute as to Counts I, II, II, and IV against the

Defendants.   For the reasons set forth below, the Court will grant the Plaintiff's motion for

1

summary judgment as to Counts I-IV, deny the Defendants' motion to dismiss and cross-motion for summary judgment, and grant the Defendants leave to file response briefing on Counts V, VI, and VII. DN 87-1; DN 89-1.

## I.

The Plaintiff, Caesars, is a sponsor and fiduciary of the Harrahs Operating Company, Inc. Welfare Benefit Plan ("WBP" or "the Plan"), which provides a self-funded group health plan for its participants and beneficiaries. DN 51-1.  Defendant Johnson was enrolled in Caesars' WBP as a participant at all relevant times. DN 51-1.  Johnson hired the other Defendant, Clare, to represent him in a personal injury action that arose from an incident that was initially covered by Caesars' WBP.  The controversy before the Court involves the following undisputed facts.

Johnson was involved in a car accident on October 26, 2011 that caused him to suffer significant injuries. DN 29.  He received medical treatment for these injuries that he alleges exceeded $720,000 in cost. DN 53-1.  Because Johnson was a participant in Caesars' WBP at that time, however, Caesars paid $136,479.57 toward his treatment under its Plan's terms. *Id*. Then, because his damages had yet to be fully redressed, Johnson retained the services of Clare to pursue a personal injury action against the driver who caused his accident. *Id*.  Caesars became aware that Johnson was pursuing this action.  Consequently, Caesars notified Clare that, pursuant to the terms of its WBP, it would have a lien on "any proceeds due or agreed to be due to [Johnson from the third-party driver] and requested that said proceeds [be] held in trust pending resolution or adjudication of the [P]lan's claim." DN 51-15.

Clare ultimately reached a $225,000 settlement on Johnson's behalf, placed the funds in his Interest on Lawyer's Trust Account ("IOLTA account"), and notified Caesars of the recovery.  Clare then requested a copy of Caesars' WBP to assess whether Caesars' proclaimed

right to reimbursement of the $134,479.57 that it paid in medical benefits was supported by the Plan's language. DN 53-4.  Caesars responded by unintentionally providing Clare with Harrah's 2010 Health and Welfare Summary Plan Description ("Harrahs SPD"), a Summary Plan Description ("SPD") that was actually no longer in effect and had been replaced by Caesars 2011 Entertainment Health and Welfare Summary Plan Description ("Caesars SPD"). DN 53-5 (Caesars SPD); DN 51-5 (Harrahs SPD).  Clare evaluated the outdated Harrahs SPD in light of relevant caselaw and determined that Caesars was *not* entitled to reimbursement under its language. DN 53-1.  He sent a letter to Caesars explaining this position and his belief that Johnson had a right to be "made whole" for his injuries before Caesars would become entitled to reimbursement. DN 51-16.  Clare declined to reimburse Caesars in full.

Negotiations between the parties ultimately failed, and neither Johnson nor Clare have reimbursed Caesars for any portion of the $134,479.57 it paid in medical expenses on Johnson's behalf. DN 51-12.  As a result, Caesars filed suit in this Court seeking a Constructive Trust Against All Defendants and Clare's IOLTA Account (Count I), requesting enforcement of its Equitable Lien by Agreement Against All Defendants and Clare's IOLTA Account (Count II), asserting a claim of Unjust Enrichment against the Defendants (Count III), and requesting an Accounting from the Defendants (Count IV). DN 29.  Caesars also asserted state-law claims of Conversion (Count V), Tortious Interference with Contract (Count VI), and Breach of Fiduciary Duty (Count VII) against Defendant Clare. *Id*.  The Defendants filed a timely motion to dismiss Caesars state-law claims against Clare on the basis of ERISA preemption under 29 U.S.C. § 1144(a).  Before the Court resolved this motion, Caesars moved for summary judgment on all Counts, to which the Defendants responded by moving for partial summary judgment on Counts I-IV.

3

## II.

The Defendants have moved for dismissal of the Counts V, VI, and VII pursuant to Fed. R.Civ. P. 12(b)(6) on the basis of ERISA preemption.  29 U.S.C. § 1144(a).  We will address this motion first.

### A.  Standard – Motion to Dismiss

To overcome a motion to dismiss, a complaint must contain sufficient facts to state a claim for relief that is "plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  As explained in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009):

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [*Twombly, supra.*] at 556, 127 S.Ct. 1955.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.*  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S.Ct. 1955 (bracket omitted).

As noted in *Southfield Education Association v. Southfield Board of Education*, No. 13-1600, 2014 WL 2900928 (6th Cir. June 26, 2014), "A complaint will be dismissed pursuant to Rule 12(b)(6) if no law supports the claim made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Twombly*, 550 U.S. at 561-64." *Southfield Ed. Assoc.*, 2014 WL 2900928 at *2.  "The factual allegations, assumed to be true, . . . must show entitlement to relief" under "some viable legal theory." *Id*. at *2, (quoting *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

### B.  ERISA Preemption

The Defendants move the Court to dismiss Caesars' state-law claims, arguing that they are prempted by ERISA and, thus, do not stand on any viable legal theory.  Upon review, we

4

nonetheless conclude that Caesars' state-law claims for conversion (Count V), tortious interference with contract (Count VI), and breach of fiduciary duty (Count VII) are *not* preempted under ERISA § 514(a) for the reasons that follow.

ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." ERISA § 514(a), 29 U.S.C. § 1144(a) (emphasis added). The Supreme Court has attempted to remove some ambiguity from the phrase "relate to," explaining that "a law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a *connection with or reference to* such a plan." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96-97 (1983) (emphasis added). But courts have still struggled to develop "connection with or reference to" into something resembling a generally applicable standard. *See Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp. (PONI)*, 399 F.3d 692, 697 (6th Cir. 2005).

Then in 2006, the Sixth Circuit merged its decision in *PONI* with one from the Supreme Court to provide a framework that controls our analysis here – we will refer to this as the *Davila-PONI* framework. *See Briscoe v. Fine*, 444 F.3d 478, 497 (6th Cir. 2006) (citing *Aetna Health Inc. v. Davila* 542 U.S. 200, 210, 124 S. Ct. 2488, 2496, 159 L. Ed. 2d 312 (2004) and *PONI*, 399 F.3d at 698). The Court of Appeals explained that, under Sixth Circuit jurisprudence:

> ERISA preempts state laws that (1) mandate employee benefit structure or their administration; (2) provide alternative enforcement mechanisms; or (3) bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby function as a regulation of an ERISA plan itself.

*Briscoe*, at 497 (quoting *PONI*, 399 F.3d at 698). Then, drawing on the Supreme Court's decision in *Aetna Health Inc. v. Davila*, it added that a state-law claim provides "alternative enforcement mechanisms" if it: (1) "could have been brought under ERISA § 502;" and, (2) "no other independent legal duty [] is implicated by [the] defendant's action." 542 U.S. at 210.

5

*Davila* does not require, however, that the "state cause of action precisely duplicate[] a cause of action under ERISA § 502(a)" to be preempted. *Id.* at 216.  The Defendants argue that ERISA preempts Caesars' state-law claims because they provide "alternative enforcement mechanisms" under *Davila-PONI* framework. DN 45-1, p. 4.  Accordingly, we will address each prong of the *Davila* test to determine if these claims are, in fact, "alternative enforcement mechanisms" under *PONI*.

## 1.  Ability to bring claims under ERISA's civil enforcement provision, § 502

The first step in our analysis is whether Caesers could have brought its claims against Clare under ERISA § 502. *See Briscoe*, at 497-98. ERISA § 502 empowers certain enumerated persons to bring claims against certain others under its civil enforcement provision.  Pertinent here, ERISA § 502(a) provides:

> Persons empowered to bring a civil suit. A civil action may be brought –
>> (3) by a participant, beneficiary, or *fiduciary*
>>> (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or
>>> (B) to *obtain other appropriate equitable* relief (i) to redress such violations or (ii) to *enforce any provisions of this title* or the *terms of the plan* . . . .

29 U.S.C.A. § 1132 (West 2014) (emphasis added).  The parties do not dispute that Caesars is a fiduciary entitled to sue, in some capacity, under this provision.  Moreover, controlling authority has noted that § 502(a)(3) does not place limits on the universe of possible defendants that such a fiduciary can sue. *Longaberger Co. v. Kolt*, 586 F.3d 459, 468 (6th Cir. 2009) (citation omitted).  In fact, *Longaberger Co. v. Kolt* makes clear that Clare – an attorney who deposited his client's settlement into an IOLTA account where that recovery was ultimately subject to an equitable lien by agreement – is an individual whom Caesars may seek to enjoin or obtain other equitable relief

6

from under ERISA § 502(a)(3)(A) or (B). *See Longaberger*, 586 F.3d 459.  So, in essence, Caesars could have brought claims against Clare under § 502(a)(3)(B).

To be clear, that Caesars state-law claims are for monetary damages – legal relief – does not mean that its suit against Clare "could [not] have been brought under ERISA § [502]" merely because § 502 does not allow such relief.  The Sixth Circuit has acknowledged that ERISA intentionally limits the relief available from a non-fiduciary, like Clare, to "appropriate equitable relief" and that this creates a "powerful incentive to recast a potential ERISA claim against [the] non-fiduciary as a state-law claim." *McLemore v. Regions Bank*, 682 F.3d 414, 426 (6th Cir. 2012).  Nevertheless a party cannot avoid ERISA's preemptive scope by styling its claim in a manner that supplants or supplements ERISA's exclusive remedial scheme – relevant here, by asserting claims to obtain relief that ERISA does not allow. *Id*.  Congress intended ERISA to occupy this field for a reason, and a wrong committed within its bounds is to be redressed in the manner permitted. *Id*. 426-27.  As such, we find that Caesars could have brought claims against Johnson under ERISA § 502(a)(3) and *Davila*'s first prong is satisfied.

## 2.  Implication of legal duties independent of ERISA

Next, we turn to whether Caesars' state-law claims allege violations of legal duties that are independent of ERISA and the terms of Caesars' Plan. *Davila*, 542 U.S. at 210.  The Defendants argue that because all of Caesars' state-law claims require the existence of, and our interpretation of, Caesars' Plan, the legal duties Johnson allegedly violated are not independent of the Plan.  We disagree.[1]

---

[1] The Court notes that Caesars' attempts to cast all state-law claims against non-fiduciaries as "unrelated to" ERISA plans are futile. *Overall v. Sykes Health Plan Servs., Inc.*, No. CIV.A. 3:05-CV-36-H, 2006 WL 1382301, at *4 (W.D. Ky. May 16, 2006) (explaining that lodging a claim against a non-fiduciary does not save it from ERISA preemption).

In *Gardner v. Heartland Indus. Partners, LP*, the Sixth Circuit addressed, without deciding, an argument that is nearly identical to that offered by the Defendants here. *Gardner v. Heartland Indus. Partners, LP*, 715 F.3d 609 (6th Cir. 2013). There, the defendants argued that their legal duty not to tortiously interfere with the plaintiff's ERISA plan was not independent of the plan because the plaintiff's claim required the court to interpret and apply the plan's terms. *Id*. at 614. But the court found this logic troubling:

> Defendants' duty not to interfere with Plaintiff's [Plan] arises under Michigan tort law, not the terms of the [Plan] itself. . . .
> . . .
> The premise of [Defendants'] contention is that a claim is subject to complete preemption under § 1132(a)(1)(B) if *any* determination necessary to liability—rather than just the determination whether the defendant owed a particular duty—requires interpretation of the plan's terms. We have our doubts about that premise, given that *Davila's* second requirement for complete preemption is couched in terms of duty ("no legal duty ... independent of ERISA or the plan terms") rather than liability generally. *See Davila*, 542 U.S. at 210, 124 S.Ct. 2488; *see also Marin Gen. Hosp.*, 581 F.3d at 950 ("The question under the second prong of *Davila* is whether the complaint relies on a legal duty that arises independently of ERISA").

*Id*.; *cf. Mank v. Green*, 350 F. Supp. 2d 154, 158 (D. Me. 2004) (explaining that the First Circuit has "repeatedly held that a cause of action 'relates to' an ERISA plan when the court must evaluate and interpret the terms of the ERISA-regulated plan in order to determine liability under the state law.") (citing *Hampers v. W.R. Grace & Co.*, 202 F.3d 44, 52 (1st Cir.2000)). Although the *Gardner* court was able to resolve the preemption question on other grounds, we agree with and subscribe to the liability-vs-duty distinction that it unabashedly endorsed.

Here, there is no doubt that each of Caesars' state-law claims requires the Court to interpret its Plan:

> (1). to establish conversion, Caesars would have to show it had legal title to the converted funds, *see Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 (Ky. 2005);

8

(2). to establish tortious interference with contract, Caesars would have to establish that Johnson breached the Plan, *see Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d. 1, 5-6 (Ky. Ct. App. 2012); and,

(3). to establish a breach of fiduciary duty, Caesars would have to establish that Clare had a duty to keep funds in his IOLTA account because Caesars asserted a non-frivolous right to them under its Plan's terms. *See* KRPC 1.15 cmt. 3 (explaining, at the relevant time, that an attorney has a duty to hold disputed funds when the third-party claim on those funds is not frivolous).

This does not mean, however, that the legal duties Clare allegedly violated are dependent on, or arose out of, ERISA or Caesars' Plan's terms.

Black's Law Dictionary defines "duty" as: "a legal obligation that is owed or due to another and that needs to be satisfied . . . [or a] legal standard of conduct." DUTY, Black's Law Dictionary (10th ed. 2014). And like in *Gardner*, Clare's *legal obligations* not to convert Caesars' property, interfere with Caesars and Johnson's contract, or breach his duties in maintaining an IOLTA account arise under Kentucky law, not ERISA or the terms of Caesars' plan. True, Clare's *liability* is dependent on the Plan's terms insofar as the terms establish Caesars' right to the property at issue, but the Plan's language does not impose upon Clare the "legal standard[s] of conduct" that are the foundation on which Caesars state-law claims rest. *Davila* instructed us to determine whether the Defendant's actions implicated legal duties that are independent of ERISA or Caesars' Plan, not whether his liability could be established independent of ERISA or Caesars' Plan. *See Davila*, 542 U.S. at 210, 124 S.Ct. 2488; *see also Marin Gen. Hosp.*, 581 F.3d at 950 ("The question under the second prong of Davila is whether the complaint relies on a legal duty that arises independently of ERISA.").

9

Yet, the Defendant asks the Court to consider the Sixth Circuit's discussion of *Arditi v. Lighthouse International* in *Gardner* in determining whether Caesars' state-law claims meet *Davila*'s second prong.  In *Arditi*, the plaintiff's employment agreement recited his employer, Lighthouse's, obligations under a separate pension plan. *Gardner*, 715 F.3d at 613 (citing *Arditi v. Lighthouse Int'l, 676 F.3d 294* (2d Cir. 2012), *as amended* (Mar. 9, 2012)).   And when Lighthouse denied the plaintiff benefits under the plan, he brought a state-law claim for breach of the employment agreement. *Id*.   The Second Circuit found, however, that Lighthouse's "duty under the contract was entirely derivative of its duty under the plan . . . and thus the contractual duty was not 'separate and independent' of the plan for purposes of preemption." *Id*. at 613-14. The Defendants acknowledge this and invite us to apply that rule here; but what they ignore is that the plaintiff's employment agreement in *Arditi* made clear that "his benefits arose from, and were governed by, the terms of the Plan" at issue – in other words, the agreement simply reiterated the Plans terms, thus in no way creating separate legal duties. *Arditi*, 676 F.3d at 300. This is in no way comparable to the situation before us, where a defendant is alleged to have violated state-law duties that have no relation to a plan's terms in the abstract.  And as explained above, a correct reading of *Gardner* actually indicates that preemption is inappropriate here.

Given the Sixth Circuit's guidance in *Gardner*, we are convinced that Caesars' state-law claims fall short of preemption under the *Davila-PONI* framework.  The claims involve legal duties that arise under Kentucky law and are wholly independent of Caesars' Plan; ERISA does not preempt them because they fall into the category of state-law claims that "ha[ve] only a tenuous, remote, or peripheral connection with [a] covered plan[], as is the case with many laws of general applicability." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661, 115 S. Ct. 1671, 1679, 131 L. Ed. 2d 695 (1995).

*Davila*'s second prong is not met, and, therefore, the Plaintiff's state-law claims do not "provide alternative enforcement mechanisms" under the *Davila-PONI* framework.   Consequently, the Plaintiff's state-law claims are not preempted by ERISA, and the Court will deny the Defendant's motion to dismiss.

## III.

The parties have also submitted cross-motions for summary judgment.   We now turn to these motions.

### A.  Standard – Motion for Summary Judgment

A court may grant a motion for summary judgment if it finds that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).   The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).

The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp*., 303 F.2d 425 (6th Cir. 1962). However, the nonmoving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324.   It must present specific facts showing that a genuine factual

11

issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.

## B.  Equitable Lien by Agreement

Caesars contends that it is entitled to summary judgment on Counts I, II, and III because it automatically acquired an "equitable lien by agreement" in the amount of $136,479.57 on the settlement Johnson obtained in his personal injury action.  This "equitable lien," Caesars argues, was granted to it by virtue of the Summary Plan Description that it incorporated into its WBP and distributed to its participants.  The parties do not dispute that Caesars' WBP does not contain language providing Caesars with the alleged "equitable lien."  Therefore, Caesars' rights turn on two questions: (1) did Caesars' WBP sufficiently incorporate its SPD, making the SPD a part of the overall Plan? And, if so, (2) did Caesars' SPD contain language necessary to provide it with an "equitable lien by agreement" on Johnson's settlement?[2]

### 1.  Was the SPD incorporated into Caesars' Plan?

Because Caesars relies on language in its SPD, it must show that its SPD was incorporated into its Plan.  Incorporation is critical because, as held by the Supreme Court, statements in SPDs "provide communication with beneficiaries about the plan, but do not themselves constitute the *terms* of the plan." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878, 179 L. Ed. 2d 843 (2011) (emphasis in original).  This holding overturned a previous line of cases

---

[2] There is an unsettled question as to the scope of the *Amara* decision: did it mean that *any* terms of an SPD that do not conflict with other governing documents are controlling regardless of incorporation? Or is incorporation necessary? *See Rice v. Metro. Life Ins. Co.*, No. CIV. 12-83-GFVT, 2014 WL 1331155, at *6 (E.D. Ky. Mar. 31, 2014).  However, because we will find that the SPD at issue was incorporated into the governing plan document, we need not address those points of law.

suggesting that SPDs were always part of the plan that they summarized. *See Id*.  But even after *Amara*, a plan sponsor can still give a SPD controlling effect by incorporating it into its plan by reference.  *Engleson v. Unum Life Ins. Co. of Am.*, 723 F.3d 611, 620 (6th Cir. 2013) (explaining that SPDs will have controlling effect in the face of plan language so indicating) *cert. denied*, 134 S. Ct. 1024, 188 L. Ed. 2d 119 (2014); *Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 486 n. 8 (6th Cir. 2013) (noting the logic in considering an incorporated SPD as part of the Plan)(citations omitted); *Smith v. Columbia Gas of Ohio Grp. Med. Ben. Plan*, 624 F. Supp. 2d 844, 860 (S.D. Ohio 2009) (allowing Vision and Life Insurance Plans to incorporate the SPD into their Plan language); *Holmes v. Colorado Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1201 (10th Cir. 2014) (extrapolating the rule that terms not contained in a plan are enforceable if "authorized by" or "referenced in" the plan).  Caesars argues that it has so incorporated its SPD into its WBP and that the two documents comprise one "Plan" with regard to medical benefits, and we agree.

Section 1.1 of Caesars' WBP, titled "Purpose," states the following: "[t]his Plan, including all benefits provided, *summary plan descriptions* and insurance policies which appear as attachments (Plan Benefits), is a single employer welfare benefit plan within the meaning of Section 3(1) of ERISA and for all purposes under ERISA." DN 1-2, p. 7 (emphasis added). Then, under Article IV section 4.1, titled "Plan Benefits," the Plan explains that it "incorporates by reference the Plan Benefits and insurance policies and the accompanying *summary plan description* and provides legally enforceable rights to the Plan Benefits." *Id*. at p. 31.  What is more, and of particular relevance to the claims at issue, Article IV's subsection dealing with "Medical" states that "Medical coverage options are available to the Participant *subject to the terms of* and under Harrah's Operating Company Inc. Welfare Benefit Plan[,] *Summary Plan*

*Description* and Harrah's Health Clinic overview document (which are incorporated by reference herein and made a part of this Plan) or No Coverage." *Id.* (emphasis added). Hence, all three provisions indicate that the WBP incorporates the SPD.

Lest there be any doubt, Article III of Caesars' Plan, titled "Eligibility and Participation," also contains a subsection that specifically addresses "Incorporation of Plans and Policies." *Id.* at 29-30. This subsection explains that "[t]he eligibility provisions, benefit provisions, and such other provisions of the Plan Benefits . . . as are consistent with the terms and conditions of this Plan *shall be incorporated herein by reference and shall be of the same force and effect under this Plan as if they were set forth herein.*" *Id.* And as shown above, Caesars' SPD is a part of the "Plan Benefits" by virtue of Sections 1.1 – which even refers to the SPD constituted part of the "Plan Benefits" – and 4.1. Because the WBP incorporates the SPD by reference in four separate locations, "logic has it that the" SPD is as much a part of the plan as the WBP itself. *See Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 486 (6th Cir. 2013) (*citing Eugene S. v. Horizon Blue Cross Blue Shield of NJ.*, 663 F.3d 1124, 1131 (10th Cir.2011) (noting that so long as an SPD does not conflict with policy terms or contain terms not reflected in the policy, the burden is on the insurer to "demonstrate that the SPD is part of the Plan, for example, by the SPD clearly stating on its face that it is part of the Plan.")).[3] Therefore, Caesars' SPD is a governing plan document. *Cowan v. St. Johns Providence Health Sys.*, No. 11-11840, 2012 WL 1032684, at *4 (E.D. Mich. Feb. 9, 2012) *report and recommendation adopted in relevant part, rejected in part*, No. 11-CV-11840, 2012 WL 1032682 (E.D. Mich. Mar. 27, 2012).

---

[3] The Defendants argue that allowing such incorporation violates ERISA's division of authority between a plan's sponsors and the plan's administrators by allowing the administrator to set terms through an SPD. *See Amara*, 131 S.Ct. at 1877. But we distinguish a situation where a plan administrator sets terms that are different than those set by a sponsor with a situation where a plan sponsor has delegated a plan administrator the authority to set plan terms. The former is prohibited, and the latter, which we have here, is not. *See id.*; *Engleson*, 723 F.3d at 620.

Despite this finding, other decisions and Caesars' WBP terms also instruct us to enforce the terms of Caesars' SPD only to the extent that they are not in conflict with Caesars' WBP. DN 1-2., p. 30 ("[I]f any provisions in the Plan Benefits shall at any time hereafter conflict with the provisions of this Plan, such provisions of the Plan Benefits shall no longer be deemed a part of this plan."); *Liss v. Fid. Employer Servs. Co.*, 516 F. App'x 468, 473 (6th Cir. 2013) (clarifying that a summary plan description can constitute "terms" of a plan unless there is a conflict between the summary plan description and the plan)(citations omitted). Similarly, the Supreme Court has even instructed us to ignore or override the terms of an SPD if there is a conflict between the language of the SPD and the governing plan document. *See Bidwell v. University Med. Center*, 685 F.3d 613, 620 n. 2 (6th Cir.2012) (citing *Amara*, 131 S. Ct. 1866). Drawing on this command, the Defendants argue that the terms of Caesars' SPD that are at issue conflict with Caesars' WBP. Specifically, they argue that "third-party liability" provisions of the SPD conflict with the WBP because the WBP does not authorize any such terms. DN 53-1. Again, we disagree.

Though Black's Law Dictionary does not offer a definition of "conflict" aside from those sounding attorney ethics, it does define the term "inconsistent," a term that courts have used interchangeably with "conflict" in discussing terms of summary plan descriptions as compared to their governing documents. *See, e.g.*, *Liss*, 516 F. App'x at 473 ("Unlike in *Amara*, the SPD did not . . . add terms that were inconsistent with the SSIP."). Black's defines "inconsistent" as: "Lacking agreement among parts; not compatible with another fact or claim." INCONSISTENT, Black's Law Dictionary (9th ed. 2009). Here, Caesars' WBP provides its participants "[m]edical coverage options" that were "available to [Johnson] subject to the terms of and under Harrah's . . . Summary Plan Description." And that is the extent to which the WBP discusses the specifics of

any medical coverage options that a participant may select.  Unlike the SPD, the WBP does not go into "Coordination of Benefits for Your Medical Benefits," "Recovery of Excess Benefits," or "How Benefits are Paid." DN 1-2.  Nor would it, because it specifically states that participants' Medical coverage options are laid out in the incorporated Summary Plan Description and Health Clinic overview documents.

More to the point, the Defendants are correct that the WBP does not mention third-party liability or equitable liens by agreement.  They are incorrect, however, that the WBP and SPD are in conflict because "the SPD's third-party liability provisions are not authorized by any of the MPD terms." DN 53-1, p. 15.  Each term of an incorporated SPD need not be explicitly authorized by its governing plan document for the two to be "in agreement" or "compatible."  Put another way, two documents are in conflict if they address the same terms and do so in a manner such that the documents are "lacking agreement" or "incompatible;" but they are not in conflict in every instance that one document addresses something that the other does not. *See, e.g., Foster v. PPG Indus., Inc.,* 693 F.3d 1226, 1235 n. 5 (10th Cir. 2012) (finding no conflict where the governing document noted that fund withdrawals were to be made "in accordance with the procedures established by the Administrator" and the Administrator then established PIN and address change requirements in an SPD that were not mentioned in the governing document); *Pearce v. Chrysler Grp. LLC Pension Plan*, No. 10-14720, 2013 WL 5178478, at *9 (E.D. Mich. Sept. 12, 2013). The latter is the case here – the WBP authorizes the SPD to lay out the terms of its medical coverage options, and third-party-liability provision is part of these terms.  Because there is no contrary, inconsistent, or conflicting provision in the WBP, we find that the SPD and WBP are not in conflict on the terms at issue.

16

We are convinced, in short, that Caesars' plan sufficiently incorporated the terms of its SPD into its plan and that Johnson exercised his right to medical coverage options subject to those terms. The parties' are, accordingly, bound by both the SPD and WBP. However, the question of whether Caesars' SPD used required language remains.

### 2. Did the language in Caesars' SPD disavow the make-whole doctrine?

The parties' second dispute on this issue finds its roots in the Supreme Court's decisions in *Sereboff v. Mid Atlantic Services, Inc*. and *US Airways, Inc. v. McCutchen*. 547 U.S. 356, 368, 126 S. Ct. 1869, 1877, 164 L. Ed. 2d 612 (2006); 133 S. Ct. 1537, 1545, 185 L. Ed. 2d 654 (2013). In *Sereboff*, an ERISA plan required its participants to reimburse any benefits provided under the plan if that participant ultimately obtained a third-party recovery arising from the same covered injury or illness. *Sereboff*, 547 U.S. at 360-62. This portion of the plan gave it an "equitable lien by agreement" on such a recovery – in other words, the right in equity to be reimbursed for benefits paid. *Id*. at 365. The Sereboffs argued, however, that an equitable defense called the "make-whole doctrine" – which prevents plans from pursuing reimbursement until their participants are "made whole" for their injuries – trumped the plan's equitable lien by agreement. *Id*. at 368. The Court nevertheless disagreed, finding that the "lien by agreement" was itself equitable, rendering any equitable defenses "beside the point" and null. *Id*. Yet, it left open the question of whether a participant in the Sereboffs' position could assert that a plan's contract-based relief was "inappropriate under ERISA § 502(a)(3)" as requested. *Id*. at n. 2. And seven years later, the participants in *US Airways* appeared before the Court to make that exact argument.

In *US Airways*, an ERISA plan asserted an equitable lien by agreement on a participant's third-party tort settlement to recover benefits paid. 133 S. Ct. at 1543-44. The plan's terms, like

those in *Sereboff*, required that participants fully reimburse the plan for any paid expenses that the participant ultimately recovered from a third-party. *Id*. The relevant language read:

> If [US Airways] pays benefits for any claim you incur as the result of negligence, willful misconduct, or other actions of a third party, . . . [y]ou will be required to reimburse [US Airways] for amounts paid for claims out of any monies recovered from [the] third party, including, but not limited to, your own insurance company as the result of judgment, settlement, or otherwise.

*Id*. (internal citations omitted). In spite of this language, the participant argued that, because the suit was brought for "equitable relief" under ERISA § 502(a)(3), the ERISA plan could recover no more than the participant's "double recovery" – an equitable defense that would prevent the plan from seeking reimbursement beyond the portion of his settlement that was specifically apportioned to medical expenses. Why? Because the plan had only paid his medical expenses. *Id*. at 1545. In other words, the participant argued in equity that, because the plan only paid for medical expenses, it could only be reimbursed out of the portion of his recovery that was expressly allocated to compensating his medical expenses. *Id*. But the Court rejected the equitable "double recovery" rule in favor of what it deemed "express contract term[s]" that entitled US Airways to an equitable lien by agreement on "*any monies* recovered." *Id*. at 1549. (emphasis added). It reasoned that "if the agreement governs, the agreement governs," and "[t]he agreement itself becomes the measure of the parties' equities." *Id*. at 1547.

Addressing an issue at the heart of our discussion here, the *US Airways* Court explained that "[c]ourts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" *Id*. at 1549. And when the parties have contracted for an equitable lien by agreement, enforcing the lien means "holding the parties to their mutual promises" and "declining to apply rules," like the double-recovery rule, that are "at odds with the parties' expressed commitments." *Id*. Here, Caesars asks us to find that its plan subjected Johnson's third-party recovery to an "equitable lien by agreement," apply the

18

principles laid out in *Sereboff* and *US Airways*, and decline to apply the equitable make-whole doctrine in light of the parties' expressed commitments. But the analysis is not that simple.

One question from *Sereboff* and *US Airways* remains unanswered: is some particular plan language necessary to create an equitable lien by agreement that overcomes application of the equitable make-whole doctrine? This question is of importance here because it is undisputed that, prior to the *US Airways* decision, the Sixth Circuit required more specific language to reject the make-whole doctrine than was required by the Third Circuit, the circuit that *US Airways* originated in. *Compare Hiney Printing Co. v. Brantner*, 243 F.3d 956, 959 (6th Cir. 2001) *with US Airways, Inc. v. McCutchen*, No. 208CV1593, 2010 WL 3420951, at *7 (W.D. Pa. Aug. 30, 2010) *vacated and remanded*, 663 F.3d 671 (3d Cir. 2011) vacated, 133 S. Ct. 1537, 185 L. Ed. 2d 654 (2013). Hence, we are faced with an interpretive question: did *US Airways* simply apply the Third Circuit's rule or create a new standard to be applied in every circuit, implicitly overruling the Sixth Circuit?

On one hand, our Circuit requires plans to "conclusively disavow" the make-whole doctrine by being "specific in establishing both a priority to the funds recovered and a right to any full or partial recovery." *Hiney*, 243 F.3d at 959-60. On the other, the Third Circuit honors plan language that "unambiguously requires the [participant] to pay back all the money they received from the Plan." *Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley*, 248 F.3d 206 (3d. Cir. 2001). The parties do not dispute that the Sixth Circuit's standard is more demanding, and the Defendants contend that it applies to Caesars' Plan. Caesars, on the other hand, argues that *US Airways* implicitly overturned the Sixth Circuit and fashioned a new rule that binds all the federal circuits: that parties to an ERISA plan are bound simply by their "expressed commitments." DN 57, p. 10. Notwithstanding the parties' requests,

we need not determine which standard is applicable because the language used in Caesars' Plan satisfies *either standard*.[4]

> Caesars' plan section titled "HOW BENEFITS ARE PAID" provides the following:
>
> If you or your dependent incurs health care expenses that should be paid by another person or insurance policy . . . [the Plan] will automatically have a lien on any proceeds you may recover to the extent of any benefits paid under this [P]lan . . . When the third party's liability is determined and satisfied (whether by settlement, judgment, arbitration or otherwise) [the Plan] is entitled to reimbursement for the amount actually paid under this [P]lan, or the amount actually received from the third party, whichever is less.

DN 53-5, p. 5-6.[5] We will assess this language under our Sixth Circuit precedent, the more grueling standard, to determine if it "conclusively disavow[ed]" the make-whole doctrine by specifically establishing: (1). a priority to the funds recovered; and, (2). a right to any full or partial recovery. *Hiney*, 243 F.3d at 959-60.

### a. Caesars' Priority to Johnson's Recovery

First, we believe that the Plan has unambiguously established a priority to Johnson's third-party recovery. In *Phillips v. Humana Health Plans of Kentucky, Inc*., the Sixth Circuit explained in an unpublished decision that when a plan uses the term "lien" when referring to its interest in a participant's third-party recoveries, it establishes a priority on that recovery because "a lien" is another way to say "first priority" "in the parlance of the industry." 238 F.3d 423, *3 (6th Cir. 2000). The language used there was that the plan would "automatically have a lien to the extent of benefits advanced upon any recovery. . . ." *Id*.[6] Another court found that a plan's priority was illustrated by language providing that participants "shall do nothing to prejudice the

---

[4] The parties do not dispute that Caesars' Plan satisfies the "expressed commitments" standard.
[5] The Defendants have argued throughout this litigation that Caesars is bound by the language in the outdated Harrahs SPD, DN 53-5, because that is the SPD Caesars sent in response to Clare's request for the relevant plan provision. DN 53-1, p. 18. Although Caesars has argued that we should assess the language in the Caesars SPD, 51-5, instead, the Court finds it unnecessary to resolve this dispute. We ultimately find that Caesars is entitled to enforce its equitable lien by agreement under the terms of the Harrahs SPD, thus mooting Caesars' argument.
[6] The lien did, however, fail on other grounds. *Id*. at *4.

20

rights of the Plan to such reimbursement and recovery." *Findlay Indus., Inc. v. Bohanon*, No. 3:07CV1210, 2007 WL 2669191, at *3 (N.D. Ohio Aug. 14, 2007). What is clear from both decisions is that a plan need not explicitly invoke the term "priority" to establish a priority, so long as it is clear that the plan's entitlement to the funds is superior to all others. And here, mirroring the language in *Phillips*, Caesars' Plan states that it "will automatically have a lien on any proceeds [that a participant] may recover." DN 53-5. Faced with an absence of any authority indicating that such language is insufficient to establish the requisite priority, we find that Caesars' plan satisfies *Copeland*'s priority-to-funds element.

### b. Caesars' Right to Johnson's Full or Partial Recovery

Second, we also believe that the Plan unambiguously established its right to be reimbursed regardless of whether Johnson's recovery was full or partial. The Sixth Circuit has found that terms simply requiring a participant to "reimburse [the Plan] to the extent of payments made" failed to clearly establish that right. *Hiney*, 243 F.3d at 958. As the rule goes, a plan cannot be ambiguous in explaining whether the its right to reimbursement would actually apply to a participant's partial recovery. *See id*. The Sixth Circuit's ambiguity rationale led another court to reject an attempt to disavow the make-whole rule with the following language:

> In the event I receive directly the proceeds of any judgment, settlement or other recovery in connection with a legal claim for damages related to the above claim, I hereby agree that the Fund shall be entitled *to such proceeds to the extent that it paid benefits for that claim* and I will pay over the Fund such amount.

*Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 956-57 (6th Cir. 2004). In both cases, however, the plan's ambiguity arose from its failure to address a critical issue: would the plan be entitled to reimbursement in the event that the participant obtained only a partial recovery, such that he was not "made whole" for his injuries? Caesars' plan does not fail in that regard.

The reimbursement provision of Caesars' plan clearly states that it is "entitled to reimbursement for the amount actually paid [to the participant] under this [P]lan, or the amount actually received from the third party, whichever is less." DN 53-5, p. 6. First, it is our view that the phrase "whichever is less" specifically contemplates a situation where a participant only obtains a partial recovery from a third party – it is saying that if a participant ultimately recovers less from the third party than he or she had received from the Plan in benefits, the Plan would still be entitled to reimbursement. Logically, a participant who recovers less than his or her plan has paid in benefits has only obtained a partial recovery. Such a participant has not been "made whole."

Second, unlike those cases finding ambiguity in reimbursement provisions, the provision at issue mandates that the participant reimburse the Plan for the "amount *actually received* from the third party." DN 53-5, p. 6 (emphasis added). Compare this to the provision in *Milam v. American Electric Power Long Term Disability Plan*, that gave the plan a right to "any recovery" – there, the court found that "any recovery" could be read not to include partial recoveries. No. 2:11-CV-77, 2012 WL 4364304, at *7 (S.D. Ohio Sept. 24, 2012). Terms like "amount actually received," however, may be broad enough to escape the ambiguity concerns that confront the terms like "any recovery" or "any funds." *See Copeland Oaks v. Haupt*, 209 F.3d 811, 813 (6th Cir. 2000); *Milam*, 2012 WL 4364304, at *7. But because the SPD at issue goes further by coupling the phrase "amount actually received" with the "whichever is less" clarification discussed above, any ambiguity as to inclusion of partial recoveries is resolved. This leads the Court to find that the Plan unambiguously established its right to reimbursement from Johnson's full or partial recovery.

This finding is then bolstered by two district court decisions from within the Sixth Circuit, one of which this Court issued.  In those cases, language indicating that the plan had a right to reimbursement "even if the [participant] has not been made whole for the loss," *Wausau Benefits v. Progressive Ins. Co.*, 270 F. Supp. 2d 980, 988 (S.D. Ohio 2003), or "regardless whether (i) [the participant has] been fully compensated for [his or her] whole loss." *Humana Health Plans, Inc. v. Powell*, No. CIVA 3:07CV-385-H, 2008 WL 5096005, at *4 (W.D. Ky. Dec. 1, 2008) *withdrawn in part on other grounds*, 603 F. Supp. 2d 956 (W.D. Ky. 2009) were enough to satisfy the full-or-partial-recovery requirement.  Though Caesars' Plan language is not as explicit, we are convinced that it falls in line with these cases.  Consequently, we find that Caesars' Plan has clearly established its right to reimbursement from "any full or partial recovery."

Thus, this Court concludes that Caesars' plan invoked language that "conclusively disavow[ed]" the make-whole doctrine because it specifically established: 1. the plan's priority to the funds recovered; and, 2. the plan's right to any full or partial recovery.  This satisfies both the Sixth Circuit's "conclusive disavowal" standard and Caesars' proffered "expressed commitments" standard, so we need not determine which applies here.  Therefore, we find that Johnson cannot claim the protection of the make-whole doctrine, and Caesars is entitled to enforce its equitable lien by agreement against Johnson's third-party recovery.  We will grant Caesars' motion on Counts I-III.

### 3.  Accounting Request

In its motion for summary judgment on Count IV, Caesars argues that it is entitled to accounting of all settlement funds that entered into and were distributed from Clare's IOLTA account.  In support of this request, Caesars cites the following: (1). Plan language entitling it to

23

"invoke any equitable remed[y] necessary to enforce the terms of [its P]lan, DN 1-2; (2). Defendant Clare's duty to "render a full accounting" of property in his care upon request of a third party entitled to receive it under the Kentucky Rules of Professional Conduct, KRPC 1.15(b); and, (3) Kentucky caselaw explaining a plaintiff's right to have a defendant account for money or property in his or her possession. *Peter v. Gibson*, 336 S.W.3d 2, 5 (Ky. 2010) (citation omitted). Caesars explains that an accounting is necessary because it is "unable to ascertain" what of Johnson's settlement funds remain in Clare's IOLTA account and "does not possess any information" concerning the timing and disbursement of any amounts from that account. DN 51-1. Because the Defendants have not offered any response to Caesars factual or legal arguments, the Court will grant Caesars request.

### 4. Attorney Fees and Future Benefits

First, Caesars contends that it is entitled to recover attorney's fees in this matter, in part, under the terms of its Plan. But as laid out above, it is limited to equitable relief from participants of its plan, as well as non-fiduciaries. Equitable relief, moreover, does not include monetary relief in the form of attorney fees. *See Mintkenbaugh v. Cent. States*, No. 3:96-CV-348-H, 1996 WL 931993, at *3 (W.D. Ky. Dec. 9, 1996) (citing *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). We cannot find a single case within the Sixth Circuit that allowed a party to recover attorney fees under the terms of an ERISA plan. As Caesars acknowledges, attorney's fees are specifically available under ERISA 502(g), the avenue through which Caesars should pursue them in this matter. The Court will deny its request for these fees under its Plan.

Second, Caesars requests a declaration that it has a right to offset Johnson's unpaid reimbursement obligation against any entitlement to future medical benefits as they come due.

DN 1, p.7; DN 51-1, p. 3.  We find that such a declaration is appropriate under the unambiguous terms of Caesars' plan. *See, e.g.*, *Plumbers & Pipefitters Local No. 25 Welfare Fund v. Sedam*, No. 4:12-CV-04114SLDJEH, 2014 WL 2731642, at *3 (C.D. Ill. June 16, 2014).

## V.

For the reasons set forth herein, the Court will deny the Defendants motions to dismiss and for partial summary judgment, and grant the Plaintiff's motion for summary judgment as to Counts I-IV. DN 45; DN 51.  The Court has withheld adjudication on Counts V-VII and will grant the Defendants leave to file a response to Plaintiff's arguments on those counts. DN 51; DN 52.  A separate order and judgment will be entered this date in accordance with this Memorandum Opinion.

March 11, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**

25