UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CAESARS ENTERTAINMENT OPERATING                                    PLAINTIFF
COMPANY, INC., as fiduciary and on behalf of,
HARRAHS OPERATING COMPANY, INC.
WELFARE BENEFIT PLAN


v.                                                      NO. 3:13-CV-00620-CRS


MICHAEL JOHNSON, and                                              DEFENDANTS
BRIAN CLARE, individually, as administrator
and fiduciary of his client trust "IOLTA" account,
and as owner-operator of BRAIN E. CLARE –
ATTORNEY AT LAW

## MEMORANDUM OPINION

This matter is before the court on:

1. Motion by the Plaintiff, Caesars Entertainment Operating Company,  Inc., as fiduciary and on behalf of Harrahs Operating Company, Inc. Welfare Benefit Plan ("Caesars") for summary judgment on all remaining claims, Counts  V-VII, in its Amended Complaint (DN 29; DN 51); and

2. Cross-motion by the Defendant, Brian  Clare ("Clare"), in his individual capacity, as administrator and fiduciary  of his client trust "IOLTA" account, and as owner operator of Brian E.  Clare – Attorney at Law, for summary judgment on all remaining claims, Counts V-VII. (DN 68).

Fully briefed, these matters are now ripe for adjudication.   Having considered the parties' respective positions, the Court concludes that that there are no genuine issues of fact in dispute as to Caesars' state-law claims of conversion (Count V), and breach of fiduciary duty (Count VII) against Defendant Clare, but that genuine issues remain with respect to the tortious interference with contract claim (Count VI) against Clare.  For the reasons set forth below, the Court will grant in part and deny in part the Defendant's cross-motion for summary judgment and deny the Plaintiff's motion for summary judgment.

1

# I.

The parties are well aware of the facts that underlie this dispute.  Most pertinent here, Defendant Johnson was involved in a car accident and suffered significant injuries. DN 66. Because he was a participant in Caesars' Welfare Benefit Plan ("Plan") at the time, the Plan paid $136,479.57 toward his resulting medical treatment. *Id*. Unfortunately, this only covered a fraction of Johnson's medical bills.  Johnson thus retained the services of Clare to pursue a personal injury action against the driver who caused the accident. *Id*.  Caesars became aware of this action and sent Clare two letters notifying him that its Plan "may" have and, thus, "[is] claim[ing] . . . a lien on any proceeds due or agreed to be due to [Johnson from the third-party driver]" and requesting "that [Clare hold] said proceeds . . . in trust pending resolution or adjudication of the [P]lan's claim." DN 51-15.  In response, Clare requested from Caesars "an itemization of all payments made" to Johnson and "a copy of [Caesars'] policy language as it relates to" its alleged lien. DN 51-10.  Caesars promptly sent the applicable language.

Then over a period spanning from April 2012 to July 2012, Clare settled Johnson's claims and received three settlement checks – made payable to both Johnson and Clare – totaling $225,000, which he promptly deposited into his IOLTA account. DN 74.  Clare then disbursed $60,000 to Johnson, leaving $165,000 in the account, still enough to cover Caesars' purported $136,479.57 lien. *Id*.  On July 10, 2012, Clare notified Caesars by letter that he had received Johnson's settlement but explained:

> The documents which you produced for my inspection pertaining to the lien or subrogation claim do not address the question of priority.  Absent this language, the fact that the claim is an ERISA claim, does not preclude my argument.  Under Kentucky law, as well as the federal common law, a claimant such as Mr. Johnson is entitled to be "made whole" before subrogation claims accrue.  Traditionally, for that common law not to apply, the contract itself must specify a different result.  Hence, if the contract included language elevating the plan to a position of greater priority than the claimant, then, and only then, the

> made whole rule would be preempted.  Please see <u>Cagle v. Bruner</u>, 112 F.3d 1510 (11th Cir. 1997); <u>Community Ins. Co. v. Ohayon</u>, 73 F.Supp.2d 862 (N.Dist.OH 1999).
>
> I would ask that you take a further look at this and respond to my position. My client may be willing to make a nominal payment to avoid any further delay in being able to receive his settlement funds. . . .

DN 51-11.  Clare then reiterated his position – a position we considered in depth and with difficulty in our previous opinion – in three phone calls with a Plan agent from July 19 to August 8, 2012. DN 51-17.  The agent never addressed the merits of Clare's legal position in these conversations but did negotiate settlement to the extent she was authorized. *Id*.  These negotiations nevertheless failed.

On August 28, 2012, Clare sent a letter requesting a response to his July 10 letter and restating his belief that Mr. Johnson had a right to be "made whole" before Caesars could be reimbursed, a right that would negate Caesars' right to reimbursement under the circumstances. DN 51-16.  In his letter, he also offered $20,000 to settle Caesars' claimed lien but indicated that this offer would expire on August 31. *Id*.  Then on September 7, 2012, Clare left the same agent a voicemail stating that he would disburse the funds to Johnson if Caesars did not accept his $20,000 offer. DN 51-17.  After another week passed without Caesars addressing his "priority" and "made whole" arguments, Clare disbursed all but $20,000 from his IOLTA. *Id*.  Only then, on September 25, 2012, did Caesars finally respond to Clare's arguments by letter.  DN 51-22. This letter simply stated, "It is our position that a sixth or seventh Circuit Court would uphold the terms of the Plan's recovery provisions." *Id*.  But the letter was of minimal value at this juncture, for Clare had already disbursed all but $20,000 of Johnson's settlement.

The parties' dispute eventually came before this Court, and we took up the enforceability of Caesars' alleged lien on cross-motions for summary judgment. DN 66.  This issue was rather involved, and the Court was only able to resolve it by addressing: 1). whether Caesars' Summary

Plan Description, which contained the lien language, was sufficiently incorporated into Caesars' Plan; 2). whether the Court had to assess the sufficiency of this language under Sixth Circuit or federal common law standards; 3). whether the language "conclusively disavowed" the "make-whole" doctrine by specifically establishing "both a priority to the funds recovered and a right to any full or partial recovery;" and, 4). whether the fact that Caesars' sent an outdated Summary Plan Description to Clare for review affected its lien. *See* DN 66. Our analysis was then further complicated because the Plan employed language quite dissimilar from that which other courts in this arena have assessed. We nevertheless concluded that Caesars is entitled to enforce its equitable lien by agreement against Johnson's third-party recovery. Caesars now asks the Court to find Clare liable for disbursing that recovery from his IOLTA account in spite of its request that he hold it in trust.

## II.

A court may grant a motion for summary judgment if it finds that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). However, the nonmoving party is required to do more than simply show there is some

"metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence, such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324. It must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

### III.

Both parties have moved for summary judgment on Caesars' remaining state-law claims of conversion, tortious interference with contract, and breach of fiduciary duty. The Court will assess each claim in turn.

#### A. Conversion

Caesars first alleges that Clare converted the funds in his IOLTA because he disbursed them despite having notice of Caesars' lien on a portion thereof. As the Sixth Circuit recently recognized, a plaintiff must show seven (7) elements to prove conversion under Kentucky law:

> (1) the plaintiff had *legal title* to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*CNH Capital Am. LLC v. Hunt Tractor, Inc.*, 568 F. App'x 461, 466 (6th Cir. 2014), *as amended* (July 2, 2014) (*citing Ky. Ass'n of Cntys., All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005)) (emphasis added).   Defendant Clare asks the Court to focus on the "legal title" [1] element above – he argues that Caesars did not have legal title to any of Johnson's settlement at the time of alleged conversion because the checks he deposited into his IOLTA account were made payable to Johnson and Clare, not Caesars.   We agree.

First, there is no dispute that the settlement checks were made payable to Johnson and Clare, DN 68-2, at least facially giving them legal title to the funds.   Caesars did, however, hold an "equitable lien by agreement" in the amount of $136,479.57 on the settlement Clare deposited in his IOLTA.   Thus, the question becomes: does an individual holding an "equitable lien by agreement" on certain property have any legal title to that property?   The short answer is no.

In our previous opinion, we held that the Plan language "entitled [Caesars] to enforce its equitable lien by agreement [in the amount of $136,479.57] against Johnson's third-party recovery." DN 66, p. 22.   But even if the name "equitable lien by agreement" does not evince the equitable, not legal, nature of that interest, the Court even clarified that Caesars' interest merely equated to a "right in equity to be reimbursed for benefits paid." DN 66, p. 17.   Thus, it would seem that, although Caesars has an equitable right to the third-party recovery, Johnson and Clare held legal title to that property at the time of the alleged conversion.

---

[1] After initially putting forth "legal title" as a required element of conversion, DN 51-1, p. 19, Caesars appears to have had a change of heart, now arguing that it "legal title" is not required. DN 76, p. 11-12.   Yet, one case it has cited in support of this proposition, *Kendrick v. Standard Fire Ins. Co.*, does not discuss the "legal title" requirement – in fact, it explains that *Joseph Goldberger Iron Co. v. Cincinnati Iron & Steel Co.* is "instructive in comprehending the common law tort of conversion, and that case explicitly lists "legal title" as a requirement. No. CIV.A.06 141 DLB, 2007 WL 1035018, at *13 (E.D. Ky. Mar. 31, 2007)(citing 153 Ky. 20, 154 S.W. 374, 376 (1913)).   Moreover, the Sixth Circuit's more recent identification of the required elements includes "legal title" and is binding upon this Court. *CNH Capital Am. LLC*, 568 F. App'x at 466.

Indeed, the Supreme Court's decision in *Sereboff v. Mid Atlantic Medical Servivces, Inc.*, on which we relied in rendering our decision, recognized the purely equitable nature of an equitable lien by agreement when the high court assessed whether enforcing an equitable lien meant seeking "relief that w[as] typically available in equity." 547 U.S. 356, 362, 126 S. Ct. 1869, 1876, 164 L. Ed. 2d 612 (2006).  In reaching its holding, *Sereboff* first explained that an equitable lien by agreement is a "contract to convey a specific object even before it is acquired [that] make[s] the contractor a trustee as soon *as he gets title to the thing*."  547 U.S. at 367 (quoting *Barnes v. Alexander*, 232 U.S. 117, 121, 34 S.Ct. 276, 58 L.Ed. 530 (1914)).  This assumes that a party who grants an equitable lien on certain property – Johnson, in this instance – will still hold title to that property once he obtains it.   Then the Court pointed to the following quote: "'[A]n agreement to charge, or to assign . . . property not yet in existence,' although '*creat[ing] no legal estate or interest in the things* when they afterwards come into existence . . . does constitute an equitable lien upon the property.'" *Id.* (citing 4 S. Symons, Pomeroy's Equity Jurisprudence § 1236, pp. 699–700 (5th ed. 1941)) (alterations in original) (emphasis added). Read together, these excerpts from *Sereboff* leave no doubt that one holding an equitable lien by agreement in property has "no legal estate or interest" in that property.  Caesars has not seriously suggested otherwise.

In a word, Caesars and Johnson entered into an agreement to "assign . . . property not yet in existence" by virtue of Johnson's participation in Caesars' Welfare Benefit Plan.  And while that agreement did give Caesars an enforceable equitable lien on Johnson's third-party recovery, that lien: 1). gave Caesars "no legal estate or interest" in Johnson's settlement; and, 2). does not affect the reality that Clare and Johnson held legal title to the settlement while it was in Clare's IOLTA.  Of course, then, Caesars' equitable interest did not encroach upon Clare and Johnson's

legal title at the time Clare disbursed the settlement.  Because Caesars therefore cannot establish that it had legal title to the allegedly converted property, it cannot prevail on its conversion claim.  We will accordingly grant Clare's motion for summary judgment on Count V.

### B. Tortious Interference with Contract

Caesars next alleges that by disbursing disputed funds from his IOLTA account, Clare tortiously interfered with its contractual relationship with Johnson – namely, the Welfare Benefit Plan.  A claim for tortious interference with an existing contractual relationship requires the plaintiff to prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) intent to cause the contract's breach; (4) the defendant's conduct caused the breach; (5) damages; and (6) lack privilege or justification to excuse its conduct. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995).  And because "interference cases . . . turn[] almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it," the Supreme Court of Kentucky has required that the interference be "malicious or without justification, or . . . accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991); *Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 533 (Ky. Ct. App. 2005).  Here, assuming that Clare caused Johnson to breach the Plan at issue, we find that, although Clare acted without justification, the factual record still presents genuine issues as to whether Clare *intended* to cause breach.

We begin with the intent element.  The Restatement (Second) of Torts, which Kentucky has adopted for interference claims, defines "intent" as "denot[ing] the actor['s] desire to cause consequences of his act, or [his] belie[f] that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (1965); Restatement (Second) of Torts § 766 cmt j.

(1979); *Lillard v. Univ. of Louisville*, No. 3:11-CV-00554-H, 2012 WL 5878715, at *4 (W.D. Ky. Nov. 21, 2012) (explaining that Kentucky has adopted the Restatement (Second) of Torts for interference claims). In the present case, Caesars sent Clare a "Notice of Lien to Attorney" on February 20, 2012, months before Johnson's third-party settlement was obtained. DN 51-15. This notice explained that, under the terms of Johnson's "health plan," Caesars was "entitled to be subrogated to and/or reimbursed from any settlement or judgment received by or on behalf of [Johnson]." *Id*. Consequently, the notice explicitly "claim[ed] a lien on any proceeds due or agreed to be paid to [Johnson] and request[ed] that said proceeds [be] held in trust pending resolution or adjudication of the plan's claim." *Id*. Thus, from the outset, Clare was aware that the Plan would assert a contractual right to Johnson's eventual settlement. There is ample evidence showing that when Clare obtained that settlement, he *intended* to disregard that "claimed lien" by disbursing the funds in spite of it.

Even setting aside the "Notice of Lien," Clare's established ethical responsibilities contemplate that "third parties may have lawful claims against specific funds . . . in a lawyer's custody . . . [and] when the third-party claim is not frivolous under applicable law, the lawyer must refuse to surrender the property until the claims are resolved." KY ST S CT RULE 3.130, RPC Rule 3.130(1.15), cmt. 3. In fact, professionally speaking, "[a] lawyer should hold property of others with the care required of a professional fiduciary." *Id*. at cmt. 1. Clare nevertheless decided to unilaterally adjudicate Caesar's right to the settlement within just over two months of obtaining it. What is more, Clare disbursed the funds before Caesars responded to the merits of the legal position Clare had asserted on Johnson's behalf – that the "made whole" doctrine applied despite plan language to the contrary. One intending to respect the terms of Caesars' Plan might not have acted until he received such a response.

And at a basic level, the fact that Johnson consistently asserted the "made whole" doctrine is at the heart of the remaining genuine issue here.  There is a difference between advocating a legal position on behalf of a client simply because it is in that client's best interest and taking a legal position because the attorney is certain it is the correct one – the former may manifest the intent required in a tortious interference claim.  Here, the factual record is simply too bare for the Court to determine whether Clare's state of mind more resembled the former or the latter.  Weighing in Caesars' favor, Clare blatantly ignored Caesars' claimed lien, he failed to follow proper procedure for resolving such a dispute, and he asserted a legal doctrine on behalf of his client that was ultimately inapplicable; however, the fact that Clare never wavered from his position may actually weigh in Clare's favor.  But it gives the Court pause that portions of the record intimate that Clare would have disbursed his Johnson's settlement – notably, in part to compensate himself for attorney's fees – regardless of what Caesars said or did.  We will accordingly leave the "intent" element for further factual development or resolution by the factfinder.

But such genuine issues do not exist with respect to the final prong of Caesars' tortious interference claim – that the interference was malicious or *without justification*.  On this prong, Caesars notes that there were three appropriate methods through which Clare could have dealt with the parties' dispute: 1). file an action for declaratory judgment; 2). interplead the funds with the Court; or, 3). attempt alternative dispute resolution.  DN 76, p. 13.  Caesars concludes that, in light of these reasonable options *and* Clare's professional obligations, Clare cannot say that his actions were justified.  These are compelling arguments.

Clare, on the other hand, points out that he held onto the settlement for several months while waiting for a response to his legal arguments from Caesars.  But this does not justify his

10

actions because he remained well aware that Caesars was claiming a lien on the funds and that this claim was at least arguable, not frivolous.  Next he argues that he had a professional duty to "promptly deliver to [his] client any funds . . . that the client is entitled to receive." KY ST S CT RULE 3.130, RPC Rule 3.130(1.15)(b).  That professional rule, however, also unambiguously provides that it applies "[e]xcept as stated in this Rule or otherwise permitted by law." Accordingly, that duty could not have been a license to singlehandedly determine Johnson's entitlement to the settlement and disburse it without resolving Caesars' claim.  Consequently, we find that Clare acted without justification as a matter of law.

Still, because a genuine issue of material fact exists regarding Clare's intent to cause Johnson's breach of Caesars' Plan, summary judgment for either party unwarranted.  The parties may continue to develop the factual record in that respect.  The Court will therefore deny both parties' motions for summary judgment on Count VI.

## C. Breach of Fiduciary Duty

Finally, Caesars asserts that Clare breached fiduciary duties that he owed the Plan when he disbursed Johnson's settlement from his IOLTA.  As laid out by Caesars, a party claiming the breach of a fiduciary duty must first establish that a fiduciary relationship existed by showing: 1). "the relationship existed before the transaction that is the subject of the action;" 2). that reliance on the alleged fiduciary was not merely subjective; and, 3). "that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary." *Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d 229, 242 (Ky. 2013), *reh'g denied* (June 19, 2014).  "As to the second requirement, the party seeking to have a fiduciary relationship recognized must . . . show that he trusted the other party to act as a fiduciary and that such trust was reasonable under the circumstances." *In re Sallee*,

11

286 F.3d 878, 892 (6th Cir. 2002). These relationships "can be informal but they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other." *Id*. at 893. For the following reasons, Caesars cannot establish that it had such a relationship with Clare.

From the moment Caesars notified Clare that "it would have a lien on 'any proceeds due or agreed to be due to [Johnson in settlement] and requested that said proceeds [be] held in trust pending resolution . . . of [Caesars'] claim," Clare and Johnson's interests became adversarial with Caesars. Clare sought $225,000 from a third-party to compensate Johnson's over $720,000 in damages, and then Caesars claimed a lien on over half of that amount. DN 66. Then, making the adversarial nature of their relationship even more apparent, Clare sent a letter to Caesars explaining his belief that Johnson's right to be "made whole" trumped their right to reimbursement and declining to reimburse Caesars in full. Nothing in these communications manifests an "agree[ment] that [Clare] would be acting in the interest of [Caesars.]"

Caesars nevertheless argues that a fiduciary relationship was created because 1). both Defendants allegedly agreed to hold the funds in Clare's IOLTA until Caesars' claim was resolved by virtue of Johnson accepting benefits under the Plan, and 2). Caesars provided the lien notice to Clare that requested that he hold the funds in trust. DN 5-1, p. 22. These arguments miss the mark. First, it was Johnson, not Clare, who agreed to reimburse Caesars from his third-party recovery by taking benefits under the Plan. Clare was not a participant in the Plan and was not bound by its terms. Second, although Caesars' lien notice requested that Clare hold the disputed funds in trust, Clare responded by opining that Caesars lien was effectively unenforceable. By doing so, Clare put Caesars on notice that he and his client's interest were adverse to Caesars, making it unreasonable for a Caesars, a nonclient, to repose

confidence and trust in him. *Tocco v. Richman Greer Prof'l Ass'n*, 912 F. Supp. 2d 494, 525 (E.D. Mich. 2012) *aff'd*, 553 F. App'x 473 (6th Cir. 2013) (citation omitted).  Again, Clare then exacerbated that adversity by disclosing his intent to act *against* Caesars' interest and disburse the funds.  It would accordingly appear that Caesars and Clare lacked all of the indicia of a common-law fiduciary relationship.

Yet, Caesars argues that Clare is a fiduciary of any funds in his IOLTA account because his professional duties as an attorney and the "nature" of such an account mandate that he hold disputed funds until any party's rights thereto are resolved. DN 51-1, p. 22.  For this proposition, Caesars first looks to Kentucky Rule of Professional Conduct 1.15(a), which explains: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession . . . separate from the lawyer's own property." KY ST S CT RULE 3.130, RPC Rule 3.130(1.15).  Caesars then points to Comments 1 and 3 thereto, which provide, in relevant part: "A lawyer should hold property of others with the care required of a professional fiduciary;" and, "third parties may have lawful claims against specific funds . . . in a lawyer's custody . . . [and] when the third-party claim is not frivolous under applicable law, the lawyer must refuse to surrender the property until the claims are resolved." *Id*. cmt. 1 and 3.  However, the rules also unabashedly state that "[v]iolation of a rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case. . . . They are not designed to be a basis for civil liability." KY ST S CT RULE 3.130, RPC Rule 3.130 (Preamble, XXI).  Kentucky Courts have recognized the same. *Rose v. Winters, Yonker & Rousselle, P.S.C.*, 391 S.W.3d 871, 873 (Ky. Ct. App. 2012) (citing *Hill v. Willmott*, 561 S.W.2d 331, 333–34 (Ky. Ct. App. 1978) (noting that the Rules of Professional Conduct do not create a private cause of action).  Moreover, Caesars principally relies on comments to the rules, not the rules themselves.  Because this is not a Court

of Ethics, Rule 1.15(a) and its comments are of no consequence here. Caesars must point the Court elsewhere if it seeks to establish that the "nature" of an attorney's IOLTA creates a fiduciary relationship between that attorney and anyone claiming a right to funds therein.

To that end, Caesars argues that Clare is both a fiduciary and trustee of his IOLTA account because it is, in reality, *a state account*. DN 77, p. 7-8. Both of the non-binding authorities it cites for this proposition, however, do not reach such a conclusion – in fact, they merely recognize that a fiduciary relationship exists between an attorney and his or her client's funds and do not mention third-party funds.[2] IRS GCM 39601 ("lawyer is a fiduciary or trustee with respect to client monies deposited in the fund"); 1986 Ky. Op. Att'y Gen. 2-224 (1986) ("accounts for deposit of client funds held in a fiduciary capacity"). In other words, not only are these non-binding authorities, but they do not stand for the principles that Caesars claim they do. Coincidentally, these sources *do reflect* a rule that *is* worthy of application under the circumstances: attorneys "have a duty to exercise 'the most scrupulous honor, good faith and fidelity' to his or her client's interest," not to anyone else's. *Am. Cont'l Ins. Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12, 13 (Ky. Ct. App. 1998) (citing *Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky. Ct. App. 1978)). This duty would appear to undermine the idea that Clare owed Caesars fiduciary duties.

Clare, on the other hand, has acknowledged the discord between this duty and the notion that he owed fiduciary duties to any adversary – he argues that his attorney-client duties precluded him from owing fiduciary duties to Caesars, a nonclient with adverse interests. He points to a strikingly-similar case from the Supreme Court of Colorado for support. In *Accident & Injury Med. Specialists, P.C. v. Mintz*, the defendant, Mintz, was an attorney who regularly

---

[2] Of course attorneys are fiduciaries of the funds they deposit into their IOLTA accounts on behalf of their clients. These are the exact circumstances that the Kentucky Supreme Court's fiduciary framework contemplates. *See Ballard v. 1400 Willow Council of Co-Owners, Inc.*, 430 S.W.3d at 242.

referred uninsured personal injury clients to medical providers. 279 P.3d 658, 660 (Colo. 2012). These providers treated many of Mintz's clients on a lien basis; when Mintz recovered on a client's behalf, he would deposit the funds in his COLTAF account (Colorado's version of an IOLTA) *then* pay the providers for that client's bills. *Id*. at 661. When Mintz became concerned that the providers were overcharging his clients, however, he withheld payment from the providers because he believed their "liens were unenforceable." *Id*. The providers sued Mintz, arguing that he breached fiduciary duties that he owed as trustee of his COLTAF account. The providers relied in part on Colorado Rule of Professional Conduct 1.15, Colorado's identical version of Kentucky Rule of Professional Conduct 1.15. *See id* at 664.

The Supreme Court of Colorado nevertheless found that there was no fiduciary relationship between Mintz and the lien-holding providers. It explained:

> Although a COLTAF account is a "trust account," it is created and maintained by a lawyer for the benefit of the lawyer's clients within the unique structure of the disciplinary rules, a structure which protects and furthers the attorney-client relationship. *See Olsen & Brown*, 889 P.2d at 675–76. Even where a lawyer holds property of a third party that the lawyer acquired in connection with representation of a client, the lawyer's fiduciary obligations remain with the client. The lawyer's possession of third party property clearly gives rise to ethical obligations under Colo. RPC 1.15, but a rule imposing fiduciary obligations on a lawyer as trustee of funds owed to third parties in a COLTAF account would subject the lawyer to the possibility of tort liability for failing to act in the best interests of the third party with respect to those funds, interests that conflict with obligations the attorney owes the client. *See* Restatement (Second) of Trusts § 170(1) (1959) ("The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."). The rule of liability the Providers urge in this case would jeopardize the lawyer's undivided loyalties to his client. . .
>
> Here, Mintz represented his clients . . . in negotiations with the Providers to accept reduced amounts for medical services. Mintz's fiduciary obligations remained with his clients. This should have been clear to the Providers given the Providers' negotiations with Mintz concerning his clients' payment amounts for medical services.

*Id*. at 665 (citations omitted). We are persuaded by the Supreme Court of Colorado's reasoning for two reasons: 1). it rested its conclusion on the sanctity of the attorney-client relationship; and,

2). it bolstered its finding by noting that Mintz negotiated against the providers, thus leaving them no doubt as to with whom his loyalties laid.

Here, Kentucky courts have certified that they "are under a duty to protect and preserve [the attorney-client] relationship for the benefit of the general public," *Am. Cont'l Ins. Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12, 13-14 (Ky. Ct. App. 1998) (citing *In re Gilbert*, 274 Ky. 187, 118 S.W.2d 535 (1938)), and we believe that Caesars' proffered holding would conflict with that duty. And like in *Mintz*, this *legal* determination is further supported by the fact that Clare negotiated against Caesars on Johnson's behalf, making it objectively unreasonable for Caesars to rely on him as a fiduciary. As such, we refuse to find that an attorney owes fiduciary duties to any entity claiming a right to funds within his IOLTA account – especially here, where that attorney actively negotiated against that entity.

Finally, lest there be any doubt, we also reject Caesar's insinuation that Kentucky's Uniform Trust Code might establish a fiduciary relationship between the parties. DN 51-1, p. 22. Citing KRS § 386B.8-030, Caesars appears to suggest that Clare became Caesar's fiduciary because he deposited Johnson's settlement in his IOLTA, of which he was allegedly a trustee, and Caesars claimed an interest in those funds. Indeed, section 386B.8-030 of the Kentucky's Uniform Trust Code does establish that "[i]f a trust has two (2) or more beneficiaries, the trustee shall act impartially in . . . distributing the trust property, giving due regard to the beneficiaries' respective interests." Ky. Rev. Stat. Ann. § 386B.8-030 (2014). However, as Clare retorted, this Section only applies to "an express trust established by a trust instrument . . . whereby a trustee has the duty to administer a trust asset for the benefit of a named or otherwise described income or principal beneficiary, or both." Ky. Rev. Stat. Ann. § 386B.1-010; *see also* § 26:2.Creation of a trust, 4A Ky. Prac. Methods of Prac. § 26:2 (explaining that a trust's "existence may be shown

16

by any writing signed by the person sought to be charged as a trustee, if it clearly expresses the trust and sufficiently connects the trustee with the subject-matter of the trust."). Such circumstances indisputably do not exist here, and Caesars has neither offered evidence to the contrary nor advanced this argument in its briefing. Clare is not a "trustee" for purposes of KRS § 386B.8-030. Resultantly, this argument meets the same fate as Caesars' arguments above – we find that the Kentucky Uniform Trust Code fails to establish a fiduciary relationship between Caesars and Clare.

Caesars' attempts to show that it had a fiduciary relationship with Clare are unavailing. Whether by virtue of common law, the "nature" of Clare's IOLTA, the Kentucky Rules of Professional Conduct, or the Kentucky Uniform Trust code, any relationship that that Caesars and Clare did not encumber Clare with fiduciary duties. Consequently, Caesars' breach-of-fiduciary-duty claim must fail on this ground, and we need not determine reach the question of breach. The Court will therefore grant Clare's motion to dismiss Count VII.

**IV.**

For the reasons set forth herein, the Court will grant Defendant Clare's cross-motion for summary judgment as to Counts V and VII, deny Clare's cross-motion as to Count VI, and deny the Plaintiff's motion for summary judgment. DN 51-1; DN 68. A separate order and judgment will be entered this date in accordance with this Memorandum Opinion.

August 21, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**